S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**JANE SHOEMAKER**
Assistant United States Attorney
Jane.Shoemaker@usdoj.gov
**HANNAH HORSLEY**
Assistant United States Attorney
Hannah.Horsley@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
Telephone: (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:12-CR-00431-02-HA |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| HOLLY ANN GRIGSBY, | Sentencing: July 15, 2014 at 9:00 a.m. |
| **Defendant.** | |

The United States of America, by S. Amanda Marshall, United States Attorney for the District of Oregon, and Jane Shoemaker and Hannah Horsley, Assistant United States Attorneys, submits the following sentencing memorandum for the Court's consideration.

/ / /

**I.    INTRODUCTION**

On March 11, 2014, defendant Holly Ann Grigsby pled guilty to racketeering as charged in Count 1 of the indictment – that is, conducting and participating in the affairs of an enterprise through a pattern of racketeering activity, including four murders and related offenses, in violation of Title 18, United States Code, Section 1962(c). Her plea was part of a written plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), calling for a true life sentence. In exchange, the government agreed to dismiss all other counts, and the Prosecuting Attorney for Snohomish County, Washington, and the District Attorneys for Lincoln County, Oregon, and Humboldt County, California, agreed not to pursue additional charges against Ms. Grigsby relating to this case. Sentencing is set for July 15, 2014.

A presentence report (PSR) has been completed. The government agrees with the facts and guideline calculation in the PSR. The guideline range is consistent with that set forth in the parties' plea agreement. If the Court adopts the guideline and criminal history calculations set forth in the PSR, the final offense level should be treated as level 43 in Criminal History Category V, for a guideline range of life in prison.[1] The parties have agreed that a life sentence, without possibility of release, is the appropriate disposition in this case. The U.S. Probation Office also recommends a life sentence. Because this case involves a "binding" plea agreement under Rule 11(c)(1)(C), the Court must sentence defendant to life in prison, or reject the plea agreement, in which case none of the parties will be bound by its terms.

## II.    FACTS AND PROCEDURAL HISTORY

---

[1] The combined offense level was actually off the chart, at level 49 before a reduction for acceptance of responsibility, for a final offense level 46. As noted in the PSR at ¶ 111, the offense level is treated as level 43 when it exceeds that level.

Holly Grigsby has been a white supremacist since her early teens. In approximately June 2011, she met Joey Pedersen, also a long-time white supremacist, and founder of a white supremacist prison gang known as the "Aryan Soldiers." They connected immediately. Pedersen told Grigsby about his desire to start a "revolution" with a mass killing spree targeting Jewish leaders and "Zionists," to preserve what they perceive as dying American culture and the white race. Pedersen had discussed similar plans when he was in prison, and continued to discuss his plans with two inmates, Corey Wyatt and Bryce Woods, after they were all released. Pedersen also talked to Grigsby, Wyatt, and Woods about wanting to kill his father for being a child molester. Grigsby agreed Pedersen's father deserved to die and discussed other people she wanted to kill.

In early-mid September 2011, Joey Pedersen told Wyatt that the police had seen Pedersen with Woods, and he feared his parole would be revoked for associating with a known felon. Pedersen told Wyatt that he was not going back to prison, and he was going to "go off the grid to pursue his destiny" and start his revolution. Wyatt told Pedersen that he did not want to go, and asked Pedersen to accompany him to a mixed martial arts (MMA) fight in Reno on the weekend of September 16, 2011 instead. Grigsby quit her job and joined them.

When they returned from the trip, Pedersen repeated that he was going to "go off the grid" and carry out the revolution. Pedersen told Wyatt that he would first go to Washington where his father allegedly had an arsenal, and he would "rob him for everything he has," including guns and money, and "take care of" his father for being a child molester. Wyatt and his fiancé, now wife, Kimberly Scott Wyatt, took Pedersen and Grigsby to a Greyhound bus station because neither had a vehicle. Grigsby gave Wyatt a journal and asked him to give it to

Government's Sentencing Memorandum                                                Page 3

her son in case she never saw him again. Joey Pedersen took a 9mm pistol with him that he had obtained from Corey Wyatt several weeks earlier. Wyatt had given Pedersen the gun to carry out robberies in anticipation of their revolution. The gun was a Hi Point, Model C-9, luger pistol, serial number P1577584.

The Oregon Department of Corrections intercepted a letter dated September 20, 2011, from Grigsby to Alan Watkins, a co-founder of the Aryan Soldiers, postmarked in Seattle on September 27, 2011, that stated in pertinent part:

> Hailsa brother! How goes the fight on your side of the cage? It's spicing up on this side, for me anyway.
>
> Anyhate, my name is Holly, im (sic) a like minded 24 year old. Ive (sic) been putting in work for what I love since I was 13. I'm Joey's ole' lady and being the comrade he is, he wanted to get you some under the door love so here I am. Ive (sic) done four years myself so I understand how just a few lines can make or break a motherfucker whole day.
>
> Not sure how often I will be able to write because I will not be in one spot too long, the call has come and I can't wait to see what the Gods have in store for me. I will write as often as I can and if you so choose to respond, I will pick up those responses as often as is safe. … Maybe when we meet up in the hall of the slain we can swap some art over some mead. Look forward to hearing from you some how (sic) and if racial preservation calls for my death before we get to know each other, then I will see you at our ultimate destination. Stride With Pride

"Stride With Pride" is white supremacist code for Supreme White Power.

Pedersen and Grigsby stayed with Pedersen's father, David Jones "Red" Pedersen, and Red's wife, Leslie Mae "Dee Dee" Pedersen, in Washington for several days. During their stay they planned how Joey Pedersen would carry out Red Pedersen's murder.

On September 26, 2011, Joey Pedersen and Grigsby lured Red Pedersen to a remote area near Everett, Washington, under the guise that he would be taking them to the bus station and

they wanted to take a detour to look at possible campsites.  Joey Pedersen shot Red Pedersen in the back of the head with the 9mm firearm that Wyatt had given him, while Red Pedersen was driving his black Jeep Patriot in a remote area.  Grigsby was in the front passenger seat and, according to plan, pulled Red Pedersen's body sufficiently out of the way for her to climb over him and take control of the vehicle without crashing.  Red Pedersen moaned and moved for up to 30 minutes or longer, while they drove around until Red Pedersen finally died.  They covered his body with clothes, and went to several businesses where they made purchases with Red's and Dee Dee Pedersen's joint credit card, including clothing for Grigsby to change into.

The defendants returned to Red and Dee Dee Pedersen's residence, and left Red's body in the Jeep.  They entered the house and demanded Dee Dee Pedersen's credit cards and pin number from her.  Grigsby bound Dee Dee's hands and legs with duct tape, but then untied her legs and told her to move to the bedroom and get on the bed, where she re-bound Dee-Dee's legs.  Grigsby told law enforcement that she asked Dee Dee Pedersen why she supported Red Pedersen when she knew that he was a child molester, and when Dee Dee tried to defend Red, Grigsby cut Dee Dee's throat, using two different knives, a Kershaw knife and a Kabar knife, because neither was sharp enough to kill her quickly.  Joey Pedersen fed the dog chicken and prescription pills to keep the dog quiet.  The defendants bunched up sheets and a pillow around Dee Dee Pedersen's head to keep her blood from spreading, and waited for it to turn dark outside before leaving.[2]  A medical examiner later found incised wounds on both sides of Dee Dee

---

[2] Grigsby's counsel have asserted that Joey Pedersen killed Dee Dee Pedersen, and Grigsby stated at her change of plea that she did not "stab her to death."  Based on all the evidence, the government believes Grigsby did kill Dee Dee Pedersen as she confessed.  In any event, Grigsby acknowledges that she is legally responsible for Dee Dee Pedersen's murder.

Government's Sentencing Memorandum                                                                  Page 5

Pedersen's neck, including at least one wound that impacted the jugular vein, causing her to bleed to death.

Pedersen and Grigsby left the residence in Red Pedersen's vehicle, with his body still inside. They took Dee Dee Pedersen's credit cards, a check, and several of Red Pedersen's firearms with them. They drove to the Wyatts' residence in Oregon, making numerous stops along the way, where they used Red's and Dee Dee's debit and/or credit cards to obtain cash and make purchases for food and gas. They arrived at Corey Wyatt's residence early on September 27, 2011. Pedersen told Wyatt that he had killed his father and that the body was inside Red Pedersen's vehicle, parked down the street. Pedersen said he needed help getting rid of the body. Corey Wyatt called Kimberly Scott Wyatt, who was staying at a friend's house, and told her there was an emergency and she needed to come home. While they were waiting, Grigsby came inside.

After Kimberly Scott Wyatt arrived, they led Pedersen and Grigsby into a wooded area near Lebanon, Oregon. When they reached a secluded area, Pedersen, Grigsby, and Corey Wyatt transferred Pedersen's and Grigsby's belongings from Red Pedersen's Jeep into the Wyatt's vehicle, then pushed the vehicle over an embankment. The Wyatts then drove Pedersen and Grigsby back to their home and told them they could stay there for one night.

Later that day, Pedersen and Grigsby told Corey Wyatt about Red Pedersen's murder, and told him that Grigsby killed Dee Dee Pedersen as well. Joey Pedersen said he and Grigsby planned how they would kill Red Pedersen. Pedersen said he shot his father in the back of the head while his father was driving, because his father was a Marine and always carried a weapon, and this way nothing would go wrong. Grigsby talked about gaining control of the vehicle

afterwards and how difficult it was not to crash, and seemed proud that she was able to do it. Joey Pedersen said he asked Grigsby to kill Dee Dee Pedersen because Dee Dee could be a witness, and also because she had stayed with his father. Pedersen said he couldn't bring himself to kill Dee Dee himself. Wyatt explained that it is a fundamental belief of white supremacists that a man can never harm a woman.

The next day the Wyatts drove Pedersen and Grigsby to several stores where they purchased camping goods and other items using Dee Dee Pedersen's credit card. Later that day the Wyatts drove Pedersen and Grigsby to the coast. Along the way, they stopped near Central Park in Corvallis, Oregon, and Grigsby disposed of a backpack containing clothes with Red Pedersen's blood on them, credit cards belonging to Red and Dee Dee Pedersen, a rifle tag and paperwork for a rifle that belonged to Red Pedersen, and a note that said "J Federation of Greater Seattle" and had an address and phone number for the Jewish Federation of Greater Seattle. The Wyatts dropped Pedersen and Grigsby off on the side of the road west of Philomath with their belongings to resume their "revolution," and said good bye.

After camping near the Oregon coast for three nights, Pedersen and Grigsby planned a carjacking so they could continue their mission. They got a ride to Don David Park in Newport on the night of September 30. The following afternoon, on October 1, Grigsby approached Cody Myers, a 19 year old college student who had attended a Jazz Festival in Newport that day, and asked him for a ride. After Myers agreed and Grigsby got in his vehicle, Joey Pedersen got into the rear passenger seat and pulled the 9mm pistol on Myers. The defendants forced Myers to drive to the spot where Joey Pedersen and Grigsby had been camping, and told him they were going to take his car.

Government's Sentencing Memorandum                                                                                              Page 7

While the three were out of the vehicle, Joey Pedersen shot Myers twice in the chest, and told Grigsby to get in the car and drive. Myers and Pedersen wound up in the back seat, and during the process, Pedersen shot at Myers several more times, shooting him once in the back and once in the head, killing him. Pedersen and Grigsby later drove Myers' car to a remote location where they took Myers' wallet and dumped his body in the woods, covering it with a tarp, sleeping bag, and bags of garbage, including wipes they used to clean up after moving Myers' body.

The defendants had originally planned to carry out their revolution in Seattle or Portland. They later decided that it was too risky to stay in the area, and changed their target city to Sacramento, California. On or about October 4, 2011, Pedersen and Grigsby drove to California in Myers' vehicle. By this time, news reports indicated that Pedersen and Grigsby were suspects in the murders and were believed to be driving Myers' vehicle. Joey Pedersen and Grigsby were concerned about being spotted in Myers' car, so they planned another carjacking.

Late that evening, Grigsby approached several people at a WinCo Foods shopping center in Eureka, California, and asked if they would give her and Pedersen a ride. Eventually Reginald Alan Clark agreed to give them a ride in exchange for gas money. After driving up the highway several miles, Pedersen asked Clark to pull over so he could use a restroom. When Joey Pedersen came back, he pulled out the 9mm pistol and told Clark to move over and let Grigsby drive. Clark complied. As Grigsby drove back down the highway, Pedersen shot Clark in the head with the 9mm pistol, and Clark died. The defendants then returned to the WinCo parking lot to get their belongings. When they arrived, they realized that Clark's vehicle did not have a permanent license plate and decided that would be more conspicuous than driving Myers'

vehicle. The defendants then drove Clark's vehicle to a nearby street, covered his body with clothes, and abandoned it.

Pedersen and Grigsby were arrested in Myers' stolen vehicle in the Northern District of California on October 5, 2011, after a California Highway Patrol officer recognized the description of the vehicle. An officer located multiple guns in the car, including the 9mm Hi-Point pistol that Corey Wyatt had given Pedersen. Ballistics and DNA testing confirmed that the gun was used to kill Red Pedersen, Cody Myers, and Reginald Clark. Grigsby was found in possession of a wallet that contained identification of Cody Faye Myers. Grigsby also had a .22 caliber magazine loaded with five rounds in her pocket, and was found in possession of a folding Kershaw knife. A Kabar knife was found in the trunk. Laboratory analysis confirmed the presence of Dee Dee Pedersen's blood on both knives.

The police found Red Pedersen's wallet in Joey Pedersen's rear pocket. In the wallet, they found a torn-out section of a telephone book that contained the names, addresses and phone numbers for several Jewish organizations in Portland, Oregon, and a hand-written "press release" that Joey Pedersen admitted writing:

> _____ was eliminated because, as _____ of the _____ he was actively working to further Zionist interests here in America, directly threatening the existence of our culture.
>
> May this act serve notice to all Zionist agents here in America and abroad, as well as their traitorous lackeys, that there exists yet a stout-hearted resistance to those forces seeking to destroy our race. For too long the great warrior soul of the European people has lain dormant, or been spent in misguided endeavors, and we mean to revive it in an attempt to regain what has long been lost: our existence as a homogeneous cultural entity, independent and free of all alien influence.
>
> Sons of the Wolf

On October 20, 2011, the *Oregonian* newspaper, located in Portland, Oregon, received a letter that Joey Pedersen sent from the Snohomish County Jail in Everett, Washington. The letter, dated October 16, 2011, states in part:

> We sought to do our part in the struggle for racial preservation, not in the hopes that it would effect (sic) any great change in itself, but that it would serve as an example for others to follow. And that maybe the inspiration we provided would compel another Kindred spirit to follow suit, providing yet another example to follow, eventually lighting the spark that turns into the flame of all-out revolution.

Holly Grigsby made similar statements to the media.

On October 7, 2011, the police located Red Pedersen's Jeep on BLM property near Lebanon, Oregon, ten feet over an embankment, with the front end resting on a tree. Red Pedersen's body was found lying across the front seat area. He had obviously been shot in the head. An autopsy revealed that Red Pedersen was shot at near contact to close range behind the right ear, and the bullet was recovered from Red Pedersen's body. Each defendant made clear that although Joey Pedersen had personal reasons for wanting to kill Red Pedersen, this murder also furthered their overall plan in two respects: it rid the world of a degenerate who was not fit to be white, and it enabled them to get a vehicle, guns, and credit cards to move forward with their mission.

An autopsy confirmed the identification of Myers' body, and revealed that he died from multiple gunshot wounds, including one to the brain, two to the chest, and one to the mid-back. One bullet was recovered. Ballistics testing revealed that it was fired from the same Hi-Point 9mm firearm recovered from Myers' vehicle following the defendants' arrests. The autopsy also reflected that Myers' body had been moved after he was murdered. Two fired cartridge cases

Government's Sentencing Memorandum                                                                                          Page 10

were also found at the Pioneer Mountain Loop site where Pedersen and Grigsby said they camped, and they, too, were forensically linked to the 9mm Hi-Point pistol. Cigarette butts were also found at the campsite, and DNA testing linked them to Grigsby. Both said Myers was killed because he would not give up his vehicle and they needed it for the cause. In addition, both said Myers was killed to prevent him from calling the police and being a witness. Grigsby referred to the murder as a "casualty of war."

On October 7, 2011, the Eureka, California Police Department received a report that Reginald Alan Clark had been missing since Tuesday, October 4, 2011 and that his vehicle had been located. When the police arrived at the scene they saw what appeared to be a pool of dried blood under the truck that had leaked through the floor board. They found Clark's body inside the vehicle hidden underneath a mound of clothing. They also recovered a fired casing in the vehicle. An autopsy confirmed that Clark had been shot in the back of the head with a single bullet. The medical examiner recovered the bullet from Clark's skull, but it was too damaged for ballistics testing. Forensic testing of the casing, however, confirmed that it was shot from the same 9 mm Hi-point pistol recovered from Cody Myers' vehicle following the defendants' arrests. Fingerprints, DNA evidence, and other items seized from Clark's truck and elsewhere link Pedersen and Grigsby to Clark's kidnapping, robbery, and murder. Pedersen described this murder as killing two birds with one stone, because they got rid of a witness and killed a "Negro degenerate" whom Pedersen assumed was a homeless drug user. Clark was African-American.

On October 14, 2011, the Appeal-Democrat newspaper in Marysville, California published an online story about "an exclusive jailhouse interview" with Grigsby, which stated

Government's Sentencing Memorandum                                                                 Page 11

that Grigsby "sees her actions as a sacrifice for the greater good of racial preservation." In the article, Grigsby was quoted as saying, "I'm hoping the sacrifice we have made will open some people's eyes and they will wake up and hear the call. It's not as hard as they think. . . . This is what I was born to do." Grigsby was also quoted as saying, "I don't believe it did a whole lot, killing a child molester and a Negro. It is not going to accomplish what I want it to, but maybe it ignites a spark in somebody's eyes . . . that this world will carry on what we have started."

The defendants were initially charged with the aggravated murders of Red and Dee Dee Pedersen in Snohomish County, Washington, Case No. 11-1-02284. Pedersen pled guilty and was sentenced to consecutive life terms of imprisonment, one without the possibility of parole, in March 2012. While the charges were still pending against Grigsby, a federal grand jury returned and indictment charging Pedersen and Grigsby with racketeering and other offenses encompassing their entire crime spree, including all four murders. The Prosecuting Attorney for Snohomish County dismissed their charges against Grigsby in favor of federal prosecution and both defendants were brought to Oregon.

After the Attorney General announced his decision not to seek the death penalty against either defendant, Grigsby entered into her plea agreement with the government, and Pedersen later pled guilty to charges relating to the murders of Cody Myers and Reginald Clark. Pedersen will be sentenced on August 4, 2014.

## III.    SENTENCING CONSIDERATIONS

### A.    Legal Background

Although the sentencing guidelines are now advisory, *United States v. Booker*, 543 U.S. 220 (2005), they still serve as the starting point and initial benchmark in all sentencing proceedings. *Peugh v. United States*, ___ U.S. ___, 133 S. Ct. 2072, 2080 (2013); *Gall v. United States*, 552 U.S. 38, 49 (2007). They are a statutory factor that sentencing courts must consider when imposing a sentence, *see* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. Thus, when a sentencing judge's "discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Id*. at 351. In short, sentencing decisions remain "anchored" by the guidelines. *Peugh,* 133 S. Ct. at 2083.

While the guidelines remain "the lodestone of sentencing," and "cabin the exercise" of a sentencing court's discretion, *id*. at 2084, the Court must also consider all the factors under 18 U.S.C. § 3553(a), including the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. §§3553(a)(1)-(2). Other factors include the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense, 18 U.S.C. §3553(a)(7). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow. The Court must first correctly determine the applicable guideline range. *Id*. at 991. The Court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the §3553(a) factors to decide if they support the sentence suggested by the parties." *Id*. The Court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id*. The Court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id*. at 991-92.

B.   **The Appropriate Sentence in This Case**

In light of all of the facts and circumstances of this case, the parties jointly recommend that the Court sentence defendant to life in prison, without the possibility of release. The United States Probation Office agrees. This recommendation is the applicable sentencing guideline range, and the only sentence that will adequately accomplish the sentencing goals under 18 U.S.C. § 3553(a).

Fueled by hatred and her long-standing white supremacist beliefs, Ms. Grigsby participated in a shockingly serious and destructive scheme that ultimately resulted in the murders of four innocent people in the course of just ten days, and well might have resulted in countless other murders if the defendants had not been apprehended before reaching Sacramento, where they planned a mass killing spree. These murders have caused great anguish for all of the victims' families. Ms. Grigsby played a critical role in the scheme, and participated in the

planning and execution of the crimes as well as the attempted destruction of evidence. She did not get caught up in this "revolution" unwittingly or under duress. She is unflinching in her beliefs – which, according to jail correspondence, she continues to hold and espouse to this day – and has not expressed remorse for all of the destruction she has caused. She deserves a severe punishment that is commensurate with the seriousness of these crimes, and needs to be incapacitated in order to protect others who could be the objects of her intolerance and dangerousness. A severe penalty will also hopefully send the message to others that they may not act violently and harm others in the name of their beliefs. A life sentence cannot un-do the damage, but will bring some sense of justice to the victims and society for these horrific crimes.

Based on the above, the government urges the Court to accept the plea agreement and sentence defendant to life in prison, without the possibility of release.

### C. Fines, Restitution, and Forfeiture

The government does not recommend any fine, and forfeiture is not in issue.

Restitution is mandatory under 18 U.S.C. § 3663A. None of the victims have submitted any restitution claims to date, however they may still submit claims. The government will notify the defense and the Court if any restitution claims are submitted prior to sentencing. The Court may also order restitution later if claims are submitted within 90 days of sentencing. 18 U.S.C. § 3664(d)(5).

## IV. APPEAL

Defendant's plea agreement contains a standard waiver of appeal.

## V. CONCLUSION AND SENTENCING RECOMMENDATION

The guideline calculations in the presentence report are correct. Defendant's total offense level is treated as 43, her criminal history category is V, and her advisory guideline range is life. For the reasons set forth above, the Court should accept the binding plea agreement and sentence defendant to life in prison, without possibility of release.

DATED this 9th day of July 2014.

Respectfully submitted,

**S. AMANDA MARSHALL**
United States Attorney


*/s/ Jane Shoemaker*
JANE SHOEMAKER
Assistant United States Attorney


*/s/ Hannah Horsley*
HANNAH HORSLEY
Assistant United States Attorney